NO. 07-09-00344-CR; 07-09-00345-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

FEBRUARY 24, 2011

ROBERT TIJERINA, APPELLANT

v.

THE STATE OF TEXAS, APPELLEE

FROM THE 64TH DISTRICT COURT OF HALE COUNTY;

NO. A17408-0710; A17409-0710; HONORABLE ROBERT W. KINKAID JR., JUDGE

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

**OPINION**

Appellant, Robert Tijerina, was convicted of felony driving while intoxicated[1] and leaving the scene of an accident involving injury.[2]   A jury assessed punishment, enhanced by prior felony convictions, at 55 and 60 years, respectively, to run concurrently.  We will affirm.

---

[1] See TEX. PENAL CODE ANN. § 49.04(a) (West 2003), § 49.09(b)(2) (West Supp. 2010).

[2] See TEX. TRANSP. CODE ANN. § 550.021(c) (West Supp. 2010).

Factual and Procedural History

State trooper Guadalupe DeLuna responded to a report of an accident involving two vehicles, a Focus and a Cavalier. The Focus was driven by Martina Beltran, who was taken from the scene by ambulance. The driver of the Cavalier was not present when DeLuna arrived, but the Cavalier was. Also present at the scene was Jonathan Rogers, a witness to the accident. The missing driver had clipped Rogers's motorcycle just before colliding with Beltran.

Rogers had spoken to the missing driver after the accident for five to seven minutes. Rogers explained that, despite his efforts to direct the driver to stay at the scene, the driver had left on foot in a northwesterly direction. Rogers described to DeLuna the driver's physical features and clothing and observed that the driver appeared very intoxicated. DeLuna testified that, upon entering the unoccupied Cavalier, he could smell the lingering odor of alcohol. DeLuna ran the license plate number, and it came back that the Cavalier was registered to appellant's father, Pablo Tijerina, whom DeLuna knew. From information gathered at the scene and from the description of the missing driver, DeLuna thought he knew who the driver was. DeLuna's brother was acquaintances with a man who met witness Rogers's description and regularly drove a Cavalier similar in style and color to the one at the scene. DeLuna broadcast the information he had gathered to area law enforcement.

DeLuna got Rogers's contact information, and Rogers left. Shortly thereafter, sheriff's deputies called DeLuna to say that they had located a man meeting the description provided at his residence. That man was appellant. Appellant refused to

leave his house and directed the officers to leave his property. DeLuna joined the deputies at appellant's residence. DeLuna called Rogers to come over to the residence, and Rogers looked into the residence from about ten to fifteen feet.[3] Looking through a window from a vantage point in the yard, apparently somewhere between the circular drive and the residence in question, Rogers unequivocally identified appellant as the missing driver.

Prior to trial, in January, June, and October 2008, appellant filed three separate sets of motions to suppress, *inter alia*, evidence of Rogers's pretrial identification resulting from the search of appellant's residence. The trial court overruled the January motions by written order. New counsel was appointed and filed the second and third sets of motions, each being more specific than the previous motions. At the hearing on the later motions, the trial court noted the evidentiary hearing on the first motions and summarily denied the later motions to suppress.

At trial, appellant admitted that he had been drinking that day. He denied, however, having used his father's car that day although he admitted to having driven it in the past. The jury found him guilty of driving while intoxicated and leaving the scene of an accident involving injury and assessed punishment at 55 and 60 years, respectively, to be served concurrently.

---

[3] The record is not clear on how far away Rogers was from the window when he identified appellant as the driver. Rogers testified that he was about ten to fifteen feet away from the residence. An officer testified that Rogers was probably twenty feet away from the window. Yet another officer present at the residence testified that Rogers was as close as one to three feet away from the window when he identified appellant.

Appellant appeals, bringing two issues for the Court's consideration. First, he contends that the trial court violated appellant's rights under the Fourth Amendment and article 38.23[4] by denying his motion to suppress the identification when the search related to the identification was an unjustified warrantless search of a dwelling. Secondly, he contends that the trial court violated appellant's due process rights by admitting in-court identification when such evidence was the product of an impermissibly suggestive show-up procedure.

Search Leading to Pretrial Identification

In his first issue, appellant argues that "[t]he identification by Rogers used to convict appellant was obtained by an impermissible warrantless search of a dwelling, in the absence of exigent circumstances or any other legal means of justifying the search." Appellant's first point is premised on Rogers's act of peering through the window to identify appellant constituting a search for Fourth Amendment purposes. Appellant points out that he requested that the officers leave the premises before the search occurred and contends that, therefore, Rogers was trespassing when the identification occurred.

Standard and Scope of Review

We review the trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. Amador v. State, 221 S.W.3d 666, 673 (Tex.Crim.App. 2007). We give almost total deference to the trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of

---

[4] See TEX. CODE CRIM. PROC. ANN. art. 38.23 (West 2005).

credibility and demeanor, but we review *de novo* application-of-law-to-fact questions that do not turn on credibility and demeanor. Amador, 221 S.W.3d at 673; Estrada v. State, 154 S.W.3d 604, 607 (Tex.Crim.App. 2005). When the trial court does not make a finding on a relevant fact, we view the evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact supported by the record. Herrera v. State, 241 S.W.3d 520, 527 (Tex.Crim.App. 2007).

In determining whether a trial court's ruling on a motion to suppress is supported by the record, we generally only consider evidence adduced at the suppression hearing because the trial court's ruling was based on that evidence rather than evidence presented later at trial. Rachal v. State, 917 S.W.2d 799, 809 (Tex.Crim.App. 1996). However, when the suppression issue has been consensually re-litigated by the parties during the trial on the merits, we may also consider relevant trial evidence in our review. See id. Because it appears that the issues raised in the motions to suppress were raised again during trial and were again overruled by the trial court, we will consider the evidence adduced at the suppression hearing and relevant trial evidence.

Search By Private Citizen Issue

As a preliminary matter raised by appellant, we address the issues concerning the application of the Fourth Amendment in light of the fact that it was Rogers, a private citizen, who performed the conduct at issue. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. For purposes of the Fourth Amendment, a "search" occurs when the government violates a subjective

5

expectation of privacy that society considers objectively reasonable. See Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). The Fourth Amendment applies only to governmental action, not to action by a private individual who is not acting as an agent of the government or with the knowledge and participation of a government official. See United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Even a wrongful search or seizure by a private citizen does not deprive the government of the right to use evidence obtained from the wrongful search. See Walter v. United States, 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980).

The government may not encourage conduct by private persons that the government itself cannot do, and if the government encourages a search, or the private citizen searches solely for the purpose of aiding in law enforcement, the search is illegal. See Coolidge v. New Hampshire, 403 U.S. 443, 487–88, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). To determine whether a person is acting as an instrument or agent of the government, we determine (1) whether the government knew of, and acquiesced in, the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or, instead, to further his own ends. Dawson v. State, 106 S.W.3d 388, 392 (Tex.App.—Houston [1st Dist.] 2003, no pet.).

From the record, it would appear that Rogers was acting as an instrument of the State, and the State makes no contention to the contrary. Although it is unclear whether DeLuna drove Rogers to the residence or whether Rogers drove himself, the record is clear that DeLuna called Rogers and asked him to come to that certain address to see if

the person at the residence was the driver of the vehicle he witnessed at the scene of the accident.[5]  There is no indication that Rogers came to the residence and looked in the window on his own accord or to further his own ends.[6]  That said, we agree with appellant and analyze the identification procedure in terms of the Fourth Amendment.

Standing

Proof of "a reasonable expectation of privacy" is at the forefront of all Fourth Amendment claims.  Kothe v. State, 152 S.W.3d 54, 59 (Tex.Crim.App. 2004).  Any defendant seeking to suppress evidence obtained in violation of the Fourth Amendment must first show that he personally had a reasonable expectation of privacy that the government invaded.  Id. (citing Rakas v. Illinois, 439 U.S. 128, 139, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).  A defendant must prove that he or she was a "victim" of the unlawful search or seizure and has no standing to complain about the invasion of someone else's personal rights.  Id.  Only after a defendant has established standing to complain may a court consider whether he or she has suffered a substantive Fourth Amendment violation.  Id.  Although we defer to the trial court's factual findings and view them in the light most favorable to the ruling, we review *de novo* the legal issue of standing.  Id.

---

[5] DeLuna could not recall if he or any other officer escorted Rogers closer to the house.  If an officer did accompany Rogers, the record does not clearly identify who that officer was.

[6] The record shows that Rogers did not complete an accident report in connection with superficial damage to his motorcycle as a result of the minor collision with the Cavalier immediately before the collision between Beltran and the Cavalier.  Such evidence would suggest that he had no personal interest in locating the driver.

The record suggests that the officers at the residence recognized appellant's possessory right to exclude others from the property when, as appellant directed, the officers left the property for some time to await Rogers's arrival. Further, it would appear that the State recognized appellant's possessory interest in the house, having referred to the residence several times during trial as appellant's house.

Consistent with the apparent recognition that appellant had, at a minimum, a possessory interest in the residence, it appears the State never challenged standing in the trial court. That being the case, we are presented with options: (1) we may address standing as part of appellant's Fourth Amendment claim, without regard to preservation concerns, or (2) we may conclude that the State has forfeited that argument because it failed to raise it in the trial court. See Coleman v. State, 246 S.W.3d 76, 84 n.30 (Tex.Crim.App. 2008); Kothe, 152 S.W.3d at 60, 60 n.15.[7] Based on the facts presented in this case, we conclude that, by tacitly recognizing appellant's possessory interest in the property at issue and by failing to raise the issue of standing in the trial court, the State forfeited its contention that appellant lacked standing to challenge the search.

---

[7] Both Coleman and Kothe quote United States v. Price, 54 F.3d 342, 346 (7th Cir. 1995), for the proposition that, "because Rakas' principle of 'standing' is rooted in the substantive law of the Fourth Amendment and not Article III [jurisdiction of courts], the government may waive these types of standing objections."

<u>Fourth Amendment Concerns</u>

Next, we are called on to determine whether there was a search on these facts. In other words, we must determine whether the actions taken by Rogers, as an instrument of the state, invoked the protections of the Fourth Amendment.

The Fourth Amendment protects one's home. <u>Oliver v. United States</u>, 466 U.S. 170, 176, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); <u>Washington v. State</u>, 152 S.W.3d 209, 214 (Tex.App.—Amarillo 2004, no pet.). The curtilage, which is the land immediately surrounding and associated with the home, warrants the same Fourth Amendment protections that attach to the house. <u>Oliver</u>, 466 U.S. at 182 n.12. The protection afforded a home's curtilage is not unlimited though. <u>See</u> <u>Washington</u>, 152 S.W.3d at 214. In other words, an officer's entry onto the curtilage or approach to the entrances of a residence does not necessarily rise to the level of a search as contemplated by the Fourth Amendment. <u>Rodgers v. State</u>, 162 S.W.3d 698, 709 (Tex.App.—Texarkana 2005), <u>aff'd</u>, 205 S.W.3d 525 (Tex.Crim.App. 2006).

Absent express orders from a person in possession of property not to trespass, a law enforcement officer, like any other member of the public, has the right to enter on residential property and knock on the front door for the purpose of contacting the occupants. <u>Cornealius v. State</u>, 900 S.W.2d 731, 733–34 (Tex.Crim.App. 1995); <u>Washington</u>, 152 S.W.3d at 214. Because entry is impliedly authorized, there is no reasonable expectation of privacy with regard to things observed by those on the pathway to the front door. <u>Washington</u>, 152 S.W.3d at 214 (citing <u>Bower v. State</u>, 769 S.W.2d 887, 897 (Tex. Crim. App. 1989)). While a law enforcement officer may enter

9

upon the curtilage of a house in an effort to contact its occupants, the authorization may not exist if the occupant has manifested his intent to restrict access to the area. See id. at 215; Buchanan v. State, 129 S.W.3d 767, 773 (Tex.App.—Amarillo 2004, pet. ref'd).

In the instant case, the implied authority to approach the house to contact the occupant had been revoked by appellant's directions for the officers to leave the property. Here, the record shows that appellant instructed the officers at his residence to leave his property, and the record further shows that, upon such instruction, at least some of the officers complied. We take appellant's instructions as a manifestation of his intent to restrict access to the residence. See Washington, 152 S.W.3d at 215. With that, as Rogers approached the residence and stood somewhere in or near the yard of the back residence[8] after appellant had directed the officers to leave his property, they no longer enjoyed the implied authority to approach appellant's residence, and neither did Rogers, acting at their behest. So, we will treat the conduct as a search for the purposes of the Fourth Amendment. Even assuming that Rogers was standing on a pathway to which implied authority to approach would apply, once appellant made clear his intent to restrict access to the property, continued or further presence on that property was not authorized.[9]

---

[8] The record suggests that Rogers's position lay within the curtilage of that residence. Whether his position was on the pathway to approach the residence is less clear and complicated by the fact that there were two houses in the immediate area. The front residence, a portable structure of some variety, was located on a circular drive and the residence in which appellant was located was behind the front residence.

[9] The State does not advance any other justification for the warrantless search. It relies, instead, on the implied authorization for Rogers to approach the residence. The State does not contend that the search was justified by exigent circumstances or was

If evidence is obtained by an officer or other person in violation of any provision of the Constitution or laws of the State of Texas or of the Constitution or laws of the United States, it is not admissible. TEX. CODE CRIM. PROC. ANN. art. 38.23(a). Because appellant expressed his intent to restrict access to the residence and, despite that intent, the officers, through their instrument, approached his residence, they lacked the authority to remain on the property, and their presence on the property violated appellant's constitutional right to be free of unreasonable searches.[10] See U.S. CONST. amends. IV, XIV.

After having reviewed the relevant evidence both from the pretrial suppression hearing and the trial and having concluded that Rogers, acting as an instrument of the state, lacked authority to be in the position from which he identified appellant, we conclude that the trial court erred when it denied appellant's motion to suppress evidence of the pretrial identification.

---

otherwise a legally justified warrantless search. It instead maintains that there was no search because Rogers stood on the circle drive leading to appellant's residence and that they were authorized to be there by implication.

[10] Further, appellant contends, the conduct violated state law. If evidence is obtained by officers as a result of a criminal trespass, that evidence must be suppressed. See Martin v. State, 67 S.W.3d 340, 344 (Tex.App.—Texarkana 2001, pet. ref'd). Criminal trespass occurs when a person enters or remains on property after being notified that entry is forbidden or received notice to depart but failed to do so. TEX. PENAL CODE ANN. § 30.05(a) (West Supp. 2010). Written or oral notice, fencing, signs forbidding entry, purple paint marks on trees or posts, and crop cultivation all effectively place a person on notice that entry is forbidden. See id. § 30.05(b)(2).

11

Harm analysis

Having concluded that the trial court erred when it overruled appellant's motions to suppress and keeping in mind that it was evidence of Rogers's pretrial identification that should have been suppressed, we turn to a harm analysis.

We review the harm resulting from a trial court's erroneous denial of a motion to suppress and subsequent admission of evidence obtained in violation of the Fourth Amendment under the constitutional standard of Texas Rule of Appellate Procedure 44.2(a). See Hernandez v. State, 60 S.W.3d 106, 108 (Tex.Crim.App. 2001). Under Rule 44.2(a), we evaluate the entire record in a neutral, impartial, and even-handed manner, not in the light most favorable to the prosecution. Harris v. State, 790 S.W.2d 568, 586 (Tex.Crim.App. 1989). We must reverse a judgment of conviction and remand for a new trial unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. TEX. R. APP. P. 44.2(a); Hernandez, 60 S.W.3d at 108. Constitutional error may, however, be held harmless if there is "overwhelming" untainted evidence to support the conviction. Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). In our analysis, we must consider the source and nature of the error and its probable collateral implications, as well as whether declaring it harmless would be likely to encourage the State to repeat it with impunity. Harris, 790 S.W.2d at 587. We do not focus on the propriety of the outcome, but calculate, to the degree possible, the probable impact of the error on the conviction in light of the existence of other evidence. See Wesbrook v. State, 29 S.W.3d 103, 119 (Tex.Crim.App. 2000). We are called on to examine the likelihood that

the constitutional error was actually a contributing factor in the jury's deliberations in arriving at its verdict, that is, whether the error adversely affected "the integrity of the process leading to the conviction." Scott v. State, 227 S.W.3d 670, 690 (Tex.Crim.App. 2007) (citing Harris, 790 S.W.2d at 587). Our primary concern is whether there is a "reasonable possibility" that the error might have contributed to the conviction. Mosley v. State, 983 S.W.2d 249, 259 (Tex.Crim.App. 1998).

Appellant contends that he was harmed by the admission of evidence of Rogers's identification because Rogers was the sole identification witness available to the State that would show appellant was driving the vehicle at the time of the accident. Rogers did identify appellant in court. Rogers's identification was consistent throughout the investigation and trial, and he testified that his in-court identification was based on his interaction and observation of appellant at the scene of the accident, independent of any visit to appellant's residence the day of the accident. That Rogers also identified appellant through a window at appellant's house is cumulative of his in-court identification.

Further, we have testimony from DeLuna regarding his familiarity with appellant through appellant's relationship with DeLuna's brother. He testified that he recognized the green Cavalier as the vehicle he had seen appellant drive on previous occasions. The record also shows that DeLuna learned at the scene that the abandoned vehicle was registered to appellant's father. With respect to the identification element, there was a great deal of other evidence pointing to appellant as the missing driver. Based on the volume and probative value of this other evidence, we conclude there is no

"reasonable possibility" that the error might have contributed to appellant's conviction, and we hold the trial court's erroneous denial of appellant's motion to suppress to be harmless.  See Mosley, 983 S.W.2d at 259.

## In-Court Identification

In addition to his direct challenge to the procedure leading to Rogers's pretrial identification, appellant relies on the impropriety of that procedure to challenge Rogers's in-court identification.  Appellant also attacks Rogers's pretrial identification of appellant as an impermissibly suggestive show-up procedure.  He maintains that the pretrial identification was tainted by law enforcement's impermissibly suggestive show-up procedure and was the product of only a partial view at some distance and extensive priming by law enforcement that strongly suggested to Rogers that the man he was about to see was, in fact, the missing driver.  The taint of this procedure, appellant seems to contend, extended to Rogers's in-court identification of appellant, making it inadmissible as well.

### Applicable Law

Appellant relies on the reasoning in Webb v. State, 760 S.W.2d 263, 269 (Tex.Crim.App. 1988), to support his position.  In Webb, the Texas Court of Criminal Appeals observed that "[a] pretrial identification procedure may be so unnecessarily suggestive and conducive to mistaken identification that to use that identification at trial would deny the accused due process of law."  Id. (citing Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). That is to say, an in-court identification is inadmissible if it has been tainted by an impermissibly suggestive pretrial identification

procedure.  See Ibarra v. State, 11 S.W.3d 189, 195 (Tex.Crim.App. 1999).  However, it is the "substantial likelihood of misidentification" that may be engendered by such suggestive procedure that works the deprivation of due process.  Webb, 760 S.W.2d at 269.  Therefore, if the totality of the circumstances reveals no substantial likelihood of misidentification, despite a suggestive pretrial procedure, subsequent identification testimony will be deemed "reliable."  Id.  And "reliability is the linchpin in determining the admissibility of identification testimony."  Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Barley v. State, 906 S.W.2d 27, 34 (Tex. Crim. App. 1995); Webb, 760 S.W.2d at 269.

A defendant who claims that an in-court identification is inadmissible due to improper out-of-court identification procedures must show that (1) the procedures used were impermissibly suggestive and (2) the procedures gave rise to a substantial likelihood of irreparable misidentification.  Webb, 760 S.W.2d at 269; Williams v. State, 243 S.W.3d 787, 789 (Tex.App.—Amarillo 2007, pet. ref'd).  A defendant bears the burden of establishing by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive.  Barley, 906 S.W.2d at 33–34; Harris v. State, 827 S.W.2d 949, 959 (Tex.Crim.App. 1992).  In making a determination as to whether a very substantial likelihood for irreparable misidentification has been created, we consider several non-exclusive factors: (1) the witness's opportunity to view the criminal act, (2) the witness's degree of attention, (3) the accuracy of the description of the suspect, (4) the level of certainty at the time of confrontation, and (5) the time between the crime and confrontation.  Barley, 906 S.W.2d at 34–35 (citing Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).

15

Standard of Review

Whether the trial court erred in admitting into evidence a witness's identification of the accused involves a mixed question of law and fact. Loserth v. State, 963 S.W.2d 770, 772 (Tex.Crim.App. 1998); Williams, 243 S.W.3d at 789. The factors used to determine whether an impermissibly suggestive identification procedure gives rise to a substantial likelihood of irreparable misidentification are treated as historical issues of fact and are viewed in the light most favorable to the trial court's ruling. Loserth, 963 S.W.2d at 773. We, therefore, afford great deference to the trial court's resolution of the historical facts pertinent to the case; however, whether the historical facts render the identification unreliable is reviewed de novo. See id. at 773–74; Williams, 243 S.W.3d at 789.

Impermissibly suggestive

An in-field show-up procedure is generally considered to be suggestive, to some degree. See Wilson v. State, 267 S.W.3d 215, 217 (Tex.App.—Waco 2008, pet. ref'd) ("generally considered to be impermissibly suggestive"); Stewart v. State, 198 S.W.3d 60, 63 (Tex.App.—Fort Worth 2006, no pet.) (carries "a degree of suggestiveness"); Pace v. State, 986 S.W.2d 740, 744 (Tex.App.—El Paso 1999, pet. ref'd) ("dubious because of its suggestiveness"); see also Williams, 243 S.W.3d at 789–90 (reviewing an in-field show-up procedure and observing that, under Delk v. State, 855 S.W.2d 700, 706 (Tex.Crim.App. 1993), it is "possible" that such a method was impermissibly suggestive). We will assume, without deciding, that the show-up identification procedure used in the instant case was impermissibly suggestive and focus on the

16

second prong of the <u>Barley</u> test: whether, under the totality of the circumstances, there was a very substantial likelihood of irreparable misidentification. See <u>Williams</u>, 243 S.W.3d at 789 (observing that, even if the procedure used was possibly impermissibly suggestive, such a conclusion does not end the inquiry).

<u>Very Substantial Likelihood of Irreparable Misidentification</u>

Again, to determine whether the suggestive identification procedure created a very substantial likelihood of irreparable misidentification, we consider the non-exhaustive factors outlined in <u>Barley</u>, 906 S.W.2d at 35. We first note that Rogers had a good opportunity to view the criminal act. Rogers first came into contact with appellant when appellant clipped Rogers's motorcycle. Then, Rogers watched the more serious collision between appellant and Beltran. Rogers came to the accident scene and spoke with appellant. He directed appellant to stay at the scene and also refused appellant's requests that Rogers not call the police. Rogers testified that he was in appellant's presence for five to seven minutes before appellant left the scene. He added that he was between three and four feet of appellant at one point during that time period and that he was about seven feet from appellant when Rogers made the call to 9-1-1. The accident occurred midday on what Rogers described as a nice, clear day.

With respect to Rogers's degree of attention, we note that he expressed concern about the status of the drivers upon arriving at the scene. His concern would suggest

that his attention was focused on the individuals involved in the accident, though it perhaps became more focused on the nonresponsive Beltran.[11]

When DeLuna arrived, Rogers provided him a description of the driver as a Hispanic male, 5'6'' to 5'7'' in height, with black hair and a medium build, wearing a blue shirt and denim jeans. DeLuna confirmed that appellant met Rogers's description. Appellant points out that Rogers failed to note the extensive tattoos on appellant's arms. Nonetheless, it appears that Rogers description was an accurate one, and serves to add indicia of reliability to Rogers's identification.

Rogers has never equivocated on his identification of appellant, neither at the residence nor at the time of trial. During his trial testimony, Rogers was certain, regardless of any observation of appellant at the residence, that appellant was the driver. We cannot discount the fact that Rogers testified that his in-court identification was based solely on what he had observed at the scene of the collision. See Barley, 906 S.W.2d at 35.

We do note that it appears that trial was held about two years after the accident, a relatively long time frame which could weigh in favor of appellant's position. However, considering the detail and certainty of Rogers's testimony on this matter, it would seem that the time elapsed "had no recognizable effect" on Rogers's in-court identification. See id. In light of the other indicia of reliability, we do not consider the time between the collision and the confrontation conclusive.

---

[11] Further, in response to defense counsel sidebar comment on Rogers's "amazing recall," Rogers responded with an explanation that his previous experience as a certified pharmacy technician demanded that he have good recall.

We conclude that, on these facts, the indicia of reliability of the in-court identification outweigh the apparent corrupting effect of any unnecessarily suggestive pretrial identification procedure.  <u>See</u> <u>Harris</u>, 827 S.W.2d at 959.  Because appellant failed to prove by clear and convincing evidence that the pretrial identification procedure was so impermissibly suggestive that it posed a very substantial risk of misidentification, the trial court did not err in admitting Rogers's in-court identification.  We overrule appellant's second point of error.

## Conclusion

Having overruled appellant's points of error, we affirm the trial court's judgments of conviction.

Mackey K. Hancock
Justice

Publish.